UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| DAVID C. FAULKINGHAM, JR., ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil No. 04-272-P-H |
| ) | |
| CUMBERLAND COUNTY ) | |
| JAIL, et al., ) | |
| ) | |
| Defendants ) | |

**RECOMMENDED DECISION**

David Faulkingham has sued both Correctional Medical Services defendants and Cumberland County correctional officer defendants claiming that he was denied proper medical treatment while a federal pretrial detainee housed at the Cumberland County Jail. He has also complained about his access to the courts and legal research materials. Each set of defendants has separately moved for summary judgment (Docket Nos. 48 & 52). Faulkingham has responded to neither motion. I now recommend that the court **GRANT** both motions.

*Discussion*

*Summary Judgment Standard*

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). If the defendant meets this burden, Faulkingham must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir.1999) (citation and

internal punctuation omitted). I view the record on summary judgment in the light most favorable to Faulkingham, the nonmovant, drawing all reasonable inferences in his favor. Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000).

In presenting their motion, the defendants have complied with Federal Rule of Civil Procedure 56 and the District of Maine Local Rule of Civil Procedure 56. In addition to their summary judgment memoranda the defendants have each filed a statement of material facts (Docket Nos. 49 & 53) that contains record citations to various affidavits. Proceeding pro se, Faulkingham has failed to respond in any manner whatsoever to these motions. Faulkingham, thus, has not complied with subsections (c) and (e) of the Local Rule, which provides:

> c) Opposing Statement of Material Facts
> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.
> ...
> (e) Statement of Facts Deemed Admitted Unless Properly Controverted; Specific Record of Citations Required
> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Dist. Me. Loc. R. Civ. P. 56(c),(e). Faulkingham's admittedly difficult circumstance as a pro se plaintiff does not liberate Faulkingham from this pleading burden. Parkinson v. Goord, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding pro se does not otherwise relieve a litigant

2

of the usual requirements of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); see also Sirois v. Prison Health Servs., 233 F.Supp.2d 52, 53 -55 (D. Me. 2002).

*Eighth Amendment Standard*

The only constitutional violation of which these defendants are accused is that Faulkingham was denied adequate medical care while he was a detainee and that this denial amounted to deliberate indifference tantamount to cruel and unusual punishment proscribed by the Eighth Amendment.

Estelle v. Gamble, 429 U.S. 97 (1976) and Farmer v. Brennan, 511 U.S. 825 (1994) are the two United States Supreme Court cases that form the baseline for claims of this genre. The Estelle Court identified in the Eighth Amendment protection the "government's obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. at 103. It observed: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Id. See also Helling v. McKinney, 509 U.S. 25, 32 (1993) ("[T]he substantive limits on state action set by the Eighth Amendment," when it "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs" including food and medical care).

In Farmer the Court identified two prongs for inquiry into claims such as Faulkingham's. First, the deprivation alleged must be "objectively 'sufficiently serious.'" 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, under Farmer, the defendant must have a culpable state of mind, which means that the defendant was deliberate in his indifference to the inmate's health or safety. Id.

*Access to the Courts Claim*

It is beyond dispute that inmates have a constitutional right of access to the courts. Bounds v. Smith, 430 U.S. 817, 828 (1977). The prison facility has an obligation to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Id. at 828. However, an inmate advancing such a claim must demonstrate "that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim" as "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" Lewis v. Casey, 518 U.S. 343, 351 (1996) (quoting Bounds, 430 U.S. at 825). Casey addressed claims that the law library and legal assistance did not meet the inmate's needs.

Courts addressing denial of access claims involving not the general adequacy of the prison library, but rather the active interference by corrections officials through conduct, such as restrictive mail policies, have concluded that the actual injury requirement is applicable to such claims. Oliver v. Fauver, 118 F.3d 175 (3rd Cir. 1997). Accordingly, the prisoner must demonstrate that a non-frivolous legal claim was frustrated or impeded by the policies and practices of the authorities. Casey v. Lewis, 518 U.S. at 353; see also Christopher v. Harbury, 536 U.S. 403, 413-15 (2002) (holding that the right of access is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court"). Apropos this variation of denial of access to court claim, "the official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case or the loss of an opportunity to seek some particular order of relief." Id. at 414. Such claims look

4

"backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." Id. (footnotes omitted).

*Undisputed Material Facts*

David Faulkingham was transferred to the Cumberland County Jail from the Penobscot County Jail on August 6, 2004.  (Breton Aff. ¶ 2.)  Faulkingham remained in the custody of the Cumberland County Jail from August 6, 2004, until his release to the custody of the United States Marshal Service for transfer to a federal prison on June 29, 2005, with the exception of intermittent releases pertaining to court hearings.  (Id. ¶ 3.)  Faulkingham was seen by the Cumberland County Jail Medical Department on August 6, 2004, and it was noted that he had recently undergone x-rays for a shoulder injury. (Zale Aff. ¶ 5.) On August 9, 2004, the Cumberland County Jail Medical Department received an oral report from the Penobscot County Jail that Faulkingham's diagnosis was "negative for shoulder injury."  (Id. ¶ 7.)

Between August 6, 2004, and September 21, 2004, Faulkingham received consultation and treatment for his identified conditions of hemochromatosis and hypothyroidism.  (Id. ¶¶ 8-24.)  On December 28, 2004, Faulkingham submitted his first medical request to the Cumberland County Jail Medical Department pertaining to and requesting to be seen for his right shoulder. This represented Faulkingham's first complaint of right shoulder pain since his initial evaluation on August 6, 2004.  (Id. ¶ 25.)

The Cumberland County Jail is the only correctional facility in the state of Maine that is accredited with the American Correctional Association.  As part of this process, all policies and procedures are reviewed by the American Correctional Association, and accreditation is dependent upon the facility meeting the standards of the American Correctional Association. The

standards of the American Correctional Association meet the requirements of the Maine Department of Corrections' standards for jails, and, in many cases, exceed these requirements. (Id. ¶ 4.) Cumberland County Jail's Policy F-310 sets forth that the jail's medical services include, at a minimum, non-emergency medical services, non-emergency dental services, mental health services, emergency services, and twenty-four hour, seven day a week, coverage by nurse staffing on site, with a physician, physician's assistant, or nurse practitioner on call. (Id. ¶ 5.) Cumberland County Jail's Policy F-310 provides that "all medical and dental matters involving medical judgment are the sole province of the responsible physician and dentist respectively." (Id. ¶ 6.)

The Cumberland County Jail provides access to legal research, or law library, through the use of a cart containing law books. This cart is continually rotated between the jail's pods, and once it is brought to a pod it will be available for use by the inmates for three to four days. (Id. ¶ 7.) When it is time for the law cart to be transferred to another pod, the jail staff member in charge of the law cart will go into the pod and verbally request that the inmates in the pod return the law books to the cart. (Id. ¶ 8.) In the event that all books are not returned, the staff member responsible for the cart and one of the pod officers will search the cells in the pod attempting to locate all missing law books. (Id. ¶ 9.) On December 6, 2004, Diana Tilley was the staff member responsible for the law cart. (Id. ¶ 10.) On December 6, 2004, Diana Tilley went to Pod C-1 and attempted to collect law books for the law cart. She observed that there were quite a few books missing, and asked that the block officer request that the inmates return all law books. This resulted in all but five of the law books being returned. (Id. ¶ 11; Ex. 2.) Approximately an hour and a half later, Diana Tilley returned to Pod C-1 to attempt to locate the missing law books. After calling out for the inmates to return the law books, she remembered that the

previous week David Faulkingham had some law books in his room that had been reported as missing for the last four to five weeks. (Breton Aff. ¶ 12; Ex. 2.) Tilley asked Faulkingham if he had law books, and Faulkingham denied that he did. Tilley then went into Faulkingham's cell with Corrections Officer Fluet. Fluet searched the room and discovered three law books hidden under Faulkingham's bed with Faulkingham's legal notes in them. (Breton Aff. ¶ 13; Ex. 2.) As a result of the December 6, 2004, incident pertaining to the law books, and comments made by Faulkingham during the search, Faulkingham was placed on a short lockdown status. (Young Aff. ¶ 2.)

Pursuant to jail policy and Maine Department of Corrections standards, inmates can be disciplined for a minor infraction, punishable by less than 48 hours lock-down without the requirement of the disciplinary process. (Breton Aff. ¶ 14.) The on-duty supervisor for Pod C-1 on December 6, 2004, Sgt. Donald Young, was responsible for reviewing and approving Faulkingham's cell lock down. (Young Aff. ¶ 3.) For the minor rule violations arising out of Faulkingham's secreting the law books and denying it to the searching officers, Young approved a less than forty-eight-hour lock-down. (Id. ¶ 4.) Lock-down status means that the inmate is confined to his cell for twenty-three hours and allowed to come out for one hour per day. In addition, when in lock-down, the inmate can attend all scheduled jail programs. (Id. ¶ 5.) Other than the December 6, 2004, incident, Young was not involved in any disciplinary proceedings pertaining to Faulkingham. (Id. ¶ 6.)

Defendant Julie Zale is licensed as a Physician's Assistant by the Maine Board of Osteopathic Licensure. (Zale Aff. ¶1.) Zale was formerly employed by Correctional Medical Services, Inc. (CMS). (Id. ¶ 2.) In that capacity Zale worked four days per week, Monday through Thursday, in the Cumberland County Jail (CCJ), providing primary medical care to

7

inmates in that facility. (Id. ¶ 3.)   Until December 31, 2004, Defendant Maile Roper, D.O. was employed by CMS as a primary care physician.  In that capacity she worked six hours per week in the Cumberland County Jail, providing primary medical care to inmates in that facility. (Second Supp. North Aff. ¶1.)

Zale's involvement in David Faulkingham's care started on August 9, 2004.  On that date she reviewed a medical history and screening form completed by Sue Hecht, R.N., dated August 6, 2004, which reflected Faulkingham's report that he suffered from hemochromatosis, Graves Disease (controlled by medication), anxiety, post traumatic stress disorder (PTSD), and a neck injury of some kind.  The document further indicated that Faulkingham was taking valium for his anxiety and PTSD, and that he was also taking Seroquel, Inderal, Gaviscon, and Ibuprofen.  The form indicates that the Ibuprofen was being taken for a shoulder injury for which Faulkingham had recently had x-rays taken, and that the results of the x-rays needed to be checked.  (Zale Aff. ¶5 & Ex. 1.)  On August 6, 2004, Dr. Maile Roper ordered that Faulkingham be continued on Inderal (propranolol), Valium (diazepam), seroquel, and ibuprofen.  (Id. ¶ 6.)  The interdisciplinary progress note in Faulkingham's medical record for August 9, 2004, indicates that the Penobscot County Jail reported: "Negative for shoulder (rotor [sic] cuff) injury."  (Id. ¶ 7 & Ex. 2.)  On August 16, 2004, Faulkingham submitted a Health Services Request Form, in which he identified the "Nature of Problem or Request" as "liver, heart, [thyroid], sholder[sic]." According to this document, Faulkingham's request was reviewed on the date it was submitted, and it was noted that he was already scheduled to be seen in the medical department.   (Id. ¶8 & Ex. 3.)  Zale personally performed a physical assessment of Faulkingham on August 17, 2004. In her record of that assessment Zale noted his history of hemochromatosis and Graves Disease, and indicated her plan to obtain blood work, i.e., to have blood tests performed to determine the

status of his disease. On the same day Zale also drafted a "Problem List," which also became part of Mr. Faulkingham's medical record, in which she noted that his chronic problems included hemochromatosis, possible hypothyroidism, and hypertension, and that he had a history of Graves Disease that had been treated with medication. (Id. ¶9 & Exs. 4 & 5.) Hemochromatosis is a disorder of iron metabolism, which occurs as a result of excess iron accumulation in tissues and organs. The treatment of choice for hemochromatosis is therapeutic phlebotomy, the removal of blood from the patient' system, which has the effect of removing excess iron from the blood. (Id. ¶ 10.) Hypothyroidism is a condition of decreased hormone production by the thyroid gland. The goal of treatment is to replace the deficient thyroid hormone. The medication most commonly used for this purpose is levothyroxine, a synthetic hormone. (Id. ¶11 .) Zale entered orders for Mr. Faulkingham's blood work on August 17, 2004. Blood was collected and submitted to a testing laboratory on August 18, 2004, and a report was issued on August 19, 2004, which Zale reviewed that day. The results of the blood test were, for the most part, within normal ranges, and the results that were not within normal ranges were not abnormal enough to cause Zale grave or immediate concern. Faulkingham's iron level, his ferritin level, his iron saturation percentage, and his total iron binding capacity, all of which are relevant to the diagnosis of hemochromatosis, were within normal range. His level of TSH, the thyroid stimulating hormone, was slightly low, indicating moderate hypothyroidism. (Id. ¶12 & Exs. 6 & 7 .) Zale next saw Faulkingham on September 8, 2004. She discussed with Faulkingham the results of his blood work. With respect to his thyroid condition, Faulkingham informed Zale that his Synthroid, the medication used to treat hypothyroidism, had been discontinued approximately a year before. Zale and Faulkingham also discussed his diagnosis of hemochromatosis, and Faulkingham told Zale that his primary care physician had not confirmed the diagnosis. Zale's

9

plan was to recheck Mr. Faulkingham's blood work, and she entered an order to repeat the lab work in two weeks. As a result of this visit, she also renewed the medication orders that had been entered by Dr. Roper on August 6th, but ordered that Mr. Faulkingham be evaluated by a physician for his continued use of Valium. (Id. ¶13.) As ordered, Faulkingham's blood work was repeated on September 22, 2004. The results of that blood work were reviewed by another health care practitioner on September 24, 2004, and then by Zale on October 6, 2004. As of the date of this test, Faulkingham's iron level, his ferritin level, and his total iron binding capacity all remained within normal range; his iron saturation percentage was slightly elevated; and his TSH was within normal range. (Id. ¶ 14; Ex. 8.)

On September 20, 2004, Zale entered an order to have Faulkingham evaluated by a psychiatrist for Valium taper. That evaluation occurred on the same date, and a physician issued an order to gradually taper, and ultimately discontinue, Faulkingham's Valium prescription. Zale did not make the decision or enter the order to taper and discontinue the Valium. (Id. ¶ 15.) On October 6, 2004, Zale entered an order to have Faulkingham seen in the CCJ chronic care clinic, to ensure that his thyroid and iron conditions were regularly monitored. (Id. ¶16.) On October 8, 2004, Dr. Maile Roper entered an order for Faulkingham to have a hematology consultation. (Id. ¶ 17.)

Faulkingham was transferred from the Cumberland County Jail to the Penobscot County Jail on or about October 12, 2004, and then returned to the Cumberland County Jail on or about October 20, 2004. (Id. ¶ 18.) Zale saw Faulkingham again on November 3, 2004. On that date Faulkingham was concerned with follow-up for his hemochromatosis. Zale's record of this visit indicates that prior to Mr. Faulkingham's transfer he had been scheduled for a phlebotomy treatment. It was Zale's plan as a result of this visit to obtain a hematology consult and to re-

check Mr. Faulkingham's blood chemistry.  On that same date, she submitted a request for a hematology consultation.  (Id. ¶ 19.)  Blood testing was performed, as ordered, on November 3, 2004, and Zale reviewed the results on November 8, 2004.  (Id. ¶20 & Exs. 9 & 10.)  Dr. Roper saw Faulkingham on November 12, 2004, and also submitted a request for a hematology consultation.  As a result of her encounter with Faulkingham on November 12, 2004, Dr. Roper also entered an order for 0.025 mg Synthroid daily, and for a repeat test of Faulkingham's TSH level in two weeks.  (Id. ¶¶ 21 & 22.)  On November 29, 2004, the repeat TSH test ordered by Dr. Roper was performed, and the report showed Faulkingham's TSH within normal range.  Zale reviewed this report on December 2, 2004, and determined that Mr. Faulkingham was on the correct dose of Synthroid.  Thereafter, Faulkingham remained on this dose of Synthroid and his TSH levels remained within normal limits. (Id. ¶ 22 & Ex. 11.)  As a result of either Zale's request or Dr. Roper's, an appointment was made for Faulkingham to see Dr. Delvyn Case, at the Maine Center for Cancer and Blood Disorders in Scarborough, Maine, on December 21, 2004. (Id. ¶ 23.)  On December 21, 2004, Faulkingham was seen in consultation by Dr. Case at the Maine Center for Cancer and Blood Disorders.  On this occasion, Mr. Faulkingham was started on monthly phlebotomy treatments, with the objective of getting him to a ferritin level of 50, and then treating him every three months to achieve stability at that level. (Id. ¶ 24.)  Faulkingham has continued to be seen at the Maine Center for Cancer and Blood Disorders for his diagnosis of hemochromatosis, and he underwent therapeutic phlebotomy on March 17, 2005, and May 27, 2005.  Faulkingham's medical chart reflects no continuing complaints of mistreatment, failure to treat, or delay in treatment of his hemochromatosis.  (Second Supp. North Aff. ¶5.) Faulkingham continued to have blood work done thereafter. (Zale Aff.  ¶28 & Exs. 14 &15.) Specimens collected on March 17, 2005, and April 19, 2005, showed that Faulkingham's TSH

was within normal limits on both occasions; his iron was within normal range; and his iron binding capacity was only slightly lower than the lower limit of the normal range. (Second Supp. North Aff. ¶6.) On December 28, 2004, Faulkingham submitted a Health Services Request Form, asking to be seen for the previously-reported injury to his right shoulder. Faulkingham's Health Services Request Form of December 28, 2004, was his first complaint of shoulder pain since his initial evaluation in August 2004. The nurse who reviewed Faulkingham's request on that date noted that he was scheduled to be seen on December 31, 2004. (Zale Aff. ¶ 25 & Ex.12.) On December 31, 2004, Faulkingham was seen by Roper. Roper noted Faulkingham's complaint of increased shoulder pain and ordered an x-ray of the shoulder. (Id. ¶ 26.) An x-ray of Faulkingham's right shoulder was performed on January 3, 2005. The Radiologic Exam Report indicated no evidence of acute bony injury, no sign of dislocation, unremarkable soft tissues, and "normal appearance of the right shoulder" generally. (Id. ¶ 27 & Ex. 13.) On January 27, 2005, Faulkingham was seen by a medical practitioner in the Cumberland County Jail for complaints of continuing shoulder pain. The physician who saw him on this date ordered increased pain medication and x-rays with weights. (North Aff. ¶ 7, Docket 35.). The x-rays were performed on February 2, 2005, and were compared to the x-rays taken a month before. The new x-rays showed a separation of the acromioclavicular (AC) joint, but no fracture or dislocation. (Id. ¶ 8.) On February 3, 2005, Faulkingham was put in a sling for his right arm, and an orthopedic consult was ordered. (Id. ¶ 9.) Faulkingham was seen in orthopedic consultation by R. Reed Gramse, M.D., on March 4, 2005. Dr. Gramse's report of that consultation noted: "On exam he does have a mildly prominent distal clavicle on the right side. Passive ROM [range of motion] is full. He has pain on the extremes of ROM." Dr. Gramse further noted that x-rays were not available for review, but that they would be reviewed and

"[u]nless there is a surprise on the x-rays I would advise AI [anti-inflammatory] medication and see if this quiets down with time." (Id. ¶ 10 & Ex. A.) After reviewing the x-rays, Dr. Gramse concluded "I would be of the opinion that most patients with time will be reasonably comfortable with this injury. If he were to have persistent discomfort, I would consider cortisone injection. I think the last resort if his symptoms persist is excision of the distal clavicle. In view of the fact that his clavicle is not grossly elevated, I don't think reconstruction of his acromioclavicular ligaments would be appropriate." (Suppl. North Aff. ¶ 8 & Ex. 1, Docket No. 36.)

On May 24, 2005, Faulkingham reported that he had re-injured his right shoulder and sought medical attention. He was seen in the medical department the following day. (Sec. Supp. North Aff. ¶ 3.) On June 23, 2005 Mr. Faulkingham's right shoulder was injected with Kenalog and Lidocaine for pain relief. His medical chart reflects no continuing complaints of shoulder pain after that date. (Id. ¶ 4.) When he was first incarcerated at the CCJ, Mr. Faulkingham was taking Valium, Inderal (a beta blocker used to treat, among other things, narcotic withdrawal, aggressive behavior, and panic attacks), and Seroquel (an anti-psychotic). (North Aff. ¶ 12.) Initially, he was continued on all those medications. (Id. ¶ 13.) After Faulkingham's need for Valium was evaluated, the Valium was ordered tapered, and ultimately discontinued. (North Aff. ¶ 14; Zale Aff. 15.) Faulkingham's record reflects no complaints of significant mental health problems from approximately mid-September 2004 through mid-February 2005. (North Aff. ¶ 16.) In late February 2004, Faulkingham complained of increasing anxiety. In response, he was evaluated on March 2, 2005, by a Psychiatric Nurse Practitioner, who assessed him as suffering from chronic post-traumatic stress disorder (PTSD), ordered a morning dose of Seroquel to supplement the evening dose already prescribed, and prescribed Paxil, an antidepressant used to treat, among other conditions, PTSD. The notes of that encounter also

13

reflect an agreement on the part of Mr. Faulkingham to contact the mental health team as needed for his mental health complaints.  (Id. ¶ 17.)   On March 6, 2005, Faulkingham refused to continue taking Paxil because he reported that it increased his anxiety. As a result, an order was entered discontinuing his Paxil. (Id. ¶ 18.)   On March 14, 2005, Mr. Faulkingham was seen by a psychiatrist, who ordered an increase in his Seroquel. (Second Supp. North Aff. ¶ 8.)   From the time of this encounter until his transfer, Faulkingham continued to receive Seroquel at the increased dose ordered by the psychiatrist.  Faulkingham's medical chart reflects no continued mental health complaints after March 15, 2005. (Id. ¶ 9.)

It has never been the policy of CMS to deny inmates at the CCJ medical care.  To the contrary, it has been and remains the policy of CMS to provide appropriate medical care where warranted. (North Aff. ¶ 20.)   All health services personnel working in the CCJ are subject to appropriate credentialing and continuing education requirements.  At a minimum, all licensed health care personnel are obligated to obtain 12 hours of continuing education annually to meet the standards of the National Commission on Correctional Health Care, by which CMS is accredited.  (Id. ¶ 21.)  The testing, treatment, and care Faulkingham received for his multiple medical complaints have complied with the standard of care. (Zale Aff. ¶ 29.)   Julie Zale was at all times attentive to Faulkingham's complaints, and she did not ignore or minimize them.  Rather, she responded appropriately, and in a professionally competent manner, to all of Mr. Faulkingham's complaints.  (Id. ¶ 29.)   Zale's conduct did not in any way expose Faulkingham to a serious risk of medical injury.  (Id. ¶ 31.)

   Faulkingham was transferred from the CCJ to another correctional facility on June 29, 2005, and has not returned to the CCJ.  (Second Supp. North Aff. ¶ 2.)

### *Recommended Resolution*

Applying the legal standards set forth above to the record before me, it is readily apparent that Faulkingham, having failed to controvert any of the defendants' supported factual assertions, has failed to generate a trialworthy issue with respect to either his Eighth Amendment or his denial of access to court claims.

### *Conclusion*

As explained above, I recommend that the court **GRANT** both motions for summary judgment (Docket Nos. 48 & 52) because the defendants are entitled to judgment as a matter of law.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

October 19, 2005.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge